[S.F. No. 22795. In Bank. July 13, 1971]

NORTHERN CALIFORNIA POWER AGENCY, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest.

**COUNSEL**

Martin McDonough and McDonough, Holland, Schwartz, Allen & Wahrhaftig for Petitioner.

Mary Moran Pajalich, J. Calvin Simpson and James A. Blumberg for Respondent.

F. T. Searls, John C. Morrissey, William B. Kuder and Glenn West, Jr., for Real Party in Interest.

**OPINION**

**SULLIVAN, J.**—Petitioner Northern California Power Agency (NCPA) seeks review of Decision No. 77918 of the Public Utilities Commission (Commission) which grants a certificate of public convenience and necessity to Pacific Gas and Electric Company (PG&E) to construct, operate, maintain and use two new geothermal steam-electric generating units at its Geysers Power Plant. We conclude that the Commission erred in failing to give adequate consideration to, and to make appropriate findings on, the issues raised by the contention of NCPA that the contracts under which PG&E plans to purchase steam for the new generating units violate both state and federal antitrust laws. We, therefore, annul the decision.

The Geysers geothermal field, in which the proposed generating units are to be built, is located in the hot springs area of northeastern Sonoma County.[1] The existence of geothermal activity in this area has been known for more than 100 years.[2] About 1920 active exploration of the area was begun and since that time geologists and others have known that its geothermal steam can be tapped by drilling wells. However, commercial exploitation of these resources did not start until about 1955 when Magma Power Company (Magma) drilled its first steam well in the area.

Since 1955 the pace of development in The Geysers has quickened. In 1958 PG&E entered into a contract with Thermal Power Company (Thermal) and Magma for the purchase of geothermal steam to produce electricity. In 1960 PG&E installed its first electrical generating unit, which had a capacity of 12½ megawatts; in 1963 it completed a second unit of like capacity; in 1968 it constructed two additional units each of 27½ megawatt capacity. In addition, PG&E has scheduled for operation in 1971 units 5 and 6 with a combined capacity of 110 megawatts. The proceeding now engaging our attention involves the certification of units 7 and 8, which are to have a combined capacity of 110 megawatts. An application for the certification of units 9 and 10 has already been filed with the Commission.

Each of the electrical generating units operates on basically the same principle. The superheated steam produced by the wells is piped into the generating unit where, by driving a turbine, it produces electric power. The steam passes through the turbine into cooling towers and then is reinjected into the ground.

Geothermal steam obviously provides an attractive source of power for the generation of electricity. Since the conversion of geothermal steam power into electric power does not involve combustion, the process does not pollute the environment with by-products. The steam is not significantly cheaper than fossil fuels, but construction of geothermal steam-electric generating units costs less than installation of fossil fuel plants. Furthermore, steam units of relatively low capacity are economical, and the lead time for building such facilities is shorter than that required for construction of fossil fuel or nuclear plants.

Proposed units 7 and 8, involved in the present case, are the first to be built and operated under the new steam supply contracts entered into by

[1]"About 75 miles north of San Francisco an area of faulted metamorphic rocks contains a noted group of hot springs and fumaroles known as 'The Geysers,' . . ." (Waring, Thermal Springs of the United States and Other Countries of the World—A Summary, Geological Survey Professional Paper 492 (1965) p. 19.)

[2]See Auchincloss, The Devil's Canon in California (1864) 6 Continental Monthly, No. 3, pp. 280-289 cited in Waring, op. cit., fn. 1 ante, p. 260.

PG&E, Thermal, Magma, and Union Oil Company of California (Union) in 1970.[3] Under these contracts Thermal, Magma and Union agree to develop and sell exclusively to PG&E all geothermal steam derived from their present and future holdings in a specified area of Sonoma, Mendocino and Lake Counties.[4] In return PG&E agrees to construct units generating at least an additional 100 megawatts for commercial operation in 1972.

For the period 1973-1975, the agreements provide that if Thermal, Magma and Union are able to demonstrate to PG&E's satisfaction that sufficient steam is available, PG&E shall install at least 100 megawatts of additional generating capacity each year. If Thermal, Magma and Union believe they have sufficient steam for additional capacity, but PG&E disagrees, the former companies may terminate PG&E's exclusive right to purchase that block of steam for which PG&E has not agreed to install additional generating capacity.

For the period after 1975, the contracts provide that PG&E will build additional generating capacity, not in excess of 100 megawatts per year, within five years after it is informed that there is sufficient steam available. However, PG&E may postpone such construction for an additional six years (or a total of eleven years from notification of the availability of the steam) if (1) additional generating facilities would not be needed on PG&E's system, (2) adding such facilities would be inconsistent with its plans to aid and cooperate in the development of water resources of its service area, or (3) such facilities would not be competitive with the cost and comparative reliability of power from alternative sources. If PG&E does not fulfill these obligations, Magma, Thermal and Union may terminate its exclusive right to purchase that amount of steam for which PG&E has not installed additional capacity.[5] However, this right to terminate may not be exercised

---

[3]PG&E entered into a contract with Union on May 11, 1970. On the same date it executed a revised agreement with Thermal and Magma. The two agreements are identical, and each provides that PG&E's obligations under the two agreements shall not be cumulative. Thus, if PG&E builds 100 megawatts of additional capacity during 1972, it will satisfy its obligations under both contracts, even though the new facilities use only Union steam.

[4]The specified area includes approximately 182 square miles (116,480 acres) covering substantially all of the known region of geothermal activity at The Geysers. Within that area, Union, Magma and Thermal presently own steam rights to approximately 15,000 acres. More importantly, their ownership is clustered around proven wells, and they own 56 of the 65 producing wells of the area. One of PG&E's expert witnesses estimated that Magma, Thermal and Union control approximately half of the area within which steam wells might successfully be developed at The Geysers.

[5]The contracts provide that if Magma, Thermal or Union terminate PG&E's exclusive right to purchase in the period after 1975, they may use the steam for which PG&E does not agree to install additional capacity for "process, chemical or manufacturing purposes" or may sell it to others for such purposes. PG&E

with regard "to steam for capacity to be installed in any year for which PG&E has already scheduled completion of additional capacity or for steam in excess of that necessary to generate" 100 megawatts.

The contracts also provide that Magma, Thermal and Union will reimburse PG&E for part of its capital costs of any unit for which they are unable to supply sufficient steam to maintain operation at the unit's rated capacity. This loss-splitting provision applies until the unit has been operating at full capacity for a year. It also applies if PG&E's exclusive right to purchase steam has been terminated. Other portions of the contracts provide that the price paid by PG&E for the steam shall vary according to the price of fossil fuels and nuclear fuel and that the contract will continue in effect until 50 years after PG&E's most recent new unit or replacement of an existing unit has commenced commercial operation.

Petitioner NCPA is a joint powers agency of the State of California created pursuant to Government Code section 6500 et seq. by an agreement executed by 11 cities widely scattered throughout northern California.[6] Each city owns and operates a distribution system for furnishing electric power within its territory and purchases such power wholesale either from PG&E or the Central Valley Project. To meet the growing needs of its member cities, NCPA has determined that it should construct a geothermal steam-electric generating plant of 250 megawatt capacity and a nuclear plant of 1,150 megawatt capacity. In pursuance of these plans, NCPA entered into negotiations with Union and with Geothermal Resources International, another holder of steam leases in The Geysers. After these negotiations between NCPA and Union failed, Union executed its present contract with PG&E.

On May 11, 1970, PG&E filed its application with the Commission for the ex parte issuance of a certificate of public convenience and necessity (Pub. Util. Code, § 1001) authorizing construction and use of units 7 and 8 of the Geysers Power Plant. NCPA intervened as an interested party and requested a hearing, which was held on August 11 and 12, 1970. After the hearing both parties submitted extensive briefs to the Commission.

NCPA conceded that additional geothermal steam-electric generating plants are needed and that units 7 and 8 will satisfy part of that need. However, it contended that the steam supply contracts between PG&E, Union, Thermal and Magma violate state and federal antitrust laws. It urged that

asserts, but NCPA disputes, that "manufacturing purposes" includes use for generating electricity. This question of interpretation of the contracts is irrelevant to our disposition of the case. Consequently, we intimate no opinion in the matter.

[6]The 11 cities are: Alameda, Biggs, Gridley, Healdsburg, Lodi, Lompoc, Palo Alto, Redding, Roseville, Santa Clara, and Ukiah.

the Commission not grant the certificate of public convenience and necessity unless the contracts are renegotiated to remove their monopolistic features.

PG&E, on the other hand, contended that its steam supply contracts were consistent with the antitrust laws, that the contracts were totally collateral to the basic issue of whether construction of units 7 and 8 was in the public interest, that NCPA's objections were not in the public interest because they would interfere with the development of an inexpensive and nonpolluting source of power and that the objections were not fair because they would deny to PG&E a source of power developed largely through its "pioneering investment and risk."

On November 10, 1970, the Commission rendered its Decision No. 77918, ordering the issuance of a certificate of public convenience and necessity for the construction, operation, maintenance and use of units 7 and 8. After reciting many of the facts set forth above, as well as the contentions of the parties, the decision of the Commission declared:

"The only issue in this proceeding upon which we must make a finding is:

"Does Public Convenience and Necessity require the Construction, Installation, Operation and Maintenance of Units Nos. 7 and 8?

"In arriving at our findings shown below, although we have taken cognizance of the contracts between PG&E and its steam suppliers, we make no finding as to the validity thereof as between the parties thereto."

The Commision thereupon made the following findings of fact and conclusions of law:

"The Commission finds that:

"1. Undisputed evidence demonstrates the need for the new electric generation to be provided by Geysers' Units Nos. 7 and 8.

"2. There is no need to determine the issues raised by NCPA.

"3. NCPA's concern re steam supplies is based upon vague and speculative proposals.

"The Commission concludes that a certificate should be issued."

An appropriate order was included in the decision. After denial of rehearing, this review followed.

NCPA contends that the Commission erred in failing to give adequate consideration to, and to make appropriate findings on, the issues raised by its claim that PG&E's steam supply contracts violated federal and state antitrust laws. We find that these contentions have merit.

■ It is no longer open to serious question that in reaching a decision to grant or deny a certificate of public convenience and necessity, the Commission should consider the antitrust implications of the matter before it. The Commission itself has stated: " 'There can be no doubt that competition is a relevant factor in weighing the public interest,' " and that "[a]nti-trust considerations are also relevant to the issues of . . . public convenience and necessity." (*M. Lee (Radio Paging Co.)* (1966) 65 Cal. P.U.C. 635, 640 and fn. 1.)

The principle that regulatory commissions should take antitrust considerations into account in determining whether a contemplated project will advance the public interest has been reiterated on numerous occasions by the federal courts. (*Denver & R. G. W. R. Co.* v. *U.S.* (1967) 387 U.S. 485, 492-493 [18 L.Ed.2d 905, 912-913, 87 S.Ct. 1754]; *California* v. *Fed. Power Comm'n.* (1962) 369 U.S. 482, 484-485 [8 L.Ed.2d 54, 56-57, 82 S.Ct. 901]; *F.C.C.* v. *R.C.A. Communications, Inc.* (1953) 346 U.S. 86 [97 L.Ed. 1470, 73 S.Ct. 998]; *McLean Trucking Co.* v. *U.S.* (1944) 321 U.S. 67 [88 L.Ed. 544, 64 S.Ct. 370]; *Nat. Broadcasting Co.* v. *U.S.* (1943) 319 U.S. 190, 223-224 [87 L.Ed. 1344, 1366-1367, 63 S.Ct. 997]; *United States* v. *Borden Co.* (1939) 308 U.S. 188, 198-199 [84 L.Ed. 181, 190-191, 60 S.Ct. 182].) The holdings of these cases were summarized and applied in *Northern Natural Gas Co.* v. *Federal Power Com'n* (1968) 399 F.2d 953 [130 App.D.C. 220]. There the Federal Power Commission had issued an order authorizing construction of a natural gas pipeline which would carry gas from Western Canada, through parts of the Northwestern United States, to Eastern Canada. Proponents of an alternate route appealed the order, and the Court of Appeals for the District of Columbia reversed, holding that the Commission had erred in failing to make findings and conclusions relating to pertinent antitrust policies.

Speaking through Judge J. Skelly Wright, the court stated: "Although the Commission is not bound by the dictates of the antitrust laws, it is clear that antitrust concepts are intimately involved in a determination of what action is in the public interest, and therefore the Commission is obliged to weigh antitrust policy." (Fn. omitted.) (399 F.2d at p. 958.) The court explained: "This is not to suggest, however, that regulatory agencies have jurisdiction to determine violations of the antitrust laws. [Citations.] Nor are the agencies strictly bound by the dictates of these laws, for they can and do approve actions which violate antitrust policies where other economic, social and political considerations are found to be of overriding importance. In short, the antitrust laws are merely another tool which a regulatory agency employs to a greater or lesser degree to give 'understandable content to the broad statutory concept of the "public interest." ' [Citation.] But because competitive considerations are an important ele-

ment of the 'public interest,' we believe that in a case such as this the Commission was obliged to make findings related to the pertinent antitrust policies, draw conclusions from the findings, and weigh these conclusions along with other important public interest considerations. [Citations.]" (Fn. omitted.) (*Id.* at pp. 960-961.)

Indeed, the answer of the Commission in this case acknowledges the propriety of an examination of antitrust matters. It states: "When a hearing is requested under Section 1005 [of the Public Utilities Code], as in this case, the Commission will notice and hold a hearing, and may do so on its own motion, so that it may be apprised of any relevant factors bearing on the issue of public convenience and necessity. [Par.] Such factors include the effect on the environment, the economic effects *including any anti-competitive factors* . . . ." (Italics added.)

Nevertheless, PG&E contends that the Commission must disregard such matters because "Congress has given to the federal courts exclusive jurisdiction over causes of action arising under the federal antitrust laws" and because the Commission "simply lacks the necessary expertise in the field." ■ It is true that sections 4, 9, 15 and 15a of title 15 of the United States Code give the federal courts exclusive jurisdiction over antitrust actions brought by the federal government and over certain private suits under the federal antitrust laws. However, those sections clearly do not foreclose the Commission from consideration of antitrust matters. In the first place, the federal courts do not have exclusive jurisdiction over actions brought under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), California's equivalent of the Sherman and Clayton Acts. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].) Secondly, since the grant of exclusive jurisdiction to the federal courts has not been held to preclude federal administrative agencies from considering antitrust problems, there is no reason to bar state administrative agencies from such concerns. Finally, by considering antitrust issues, the Commission merely carries out its legislative mandate to determine whether the public convenience and necessity require a proposed development. That task does not impinge upon the jurisdiction of the federal courts in federal antitrust cases. As seen above, the Commission may approve projects even though they would otherwise violate the antitrust laws; it may also disapprove projects which do not violate such laws. Its consideration of antitrust problems is for purposes quite different from those of the courts; it does not usurp their function.

■ PG&E's argument that the Commission lacks the expertise necessary to judge antitrust matters is similarly meritless. We would expect the Commission to be as competent in this area as its federal counterparts

which are called upon to make simliar determinations. Furthermore, as we have already noted, a consideration of such questions is an essential part of the Commission's function. If the Commission lacked the expertise necessary to carry out that function, we think that it would be required to remedy that deficiency.

As we have seen, it is clear that the Commission must take into account the antitrust aspects of applications before it. It is equally obvious that the Commission failed to perform this essential duty in the instant case. Although the Commission heard extensive testimony and legal argument concerning the matters raised by NCPA, its decision appears to ignore the antitrust issues entirely. The Commission there stated: "In arriving at our findings shown below, although we have taken cognizance of the contracts between PG&E and its steam suppliers, we make no finding as to the validity thereof as between the parties thereto." As its second finding of fact, the Commission found that "[t]here is no need to determine the issues raised by NCPA."

We cannot agree with PG&E's contention that the Commission *must have* dealt with NCPA's claims because it received evidence and heard legal arguments on the antitrust issues. The task of the Commission extends far beyond the passive role of a sounding board. The Commission cannot discharge its duty by merely taking "cognizance of the contracts between PG&E and its steam suppliers," without evaluating their effect upon the interests of the public. ▮ It must weigh the opposing evidence and arguments in order "to determine whether the rights and interests of the general public will be advanced by the prosecution of the enterprise which it is proposed to carry on for the service of the public." (*Oro Electric Corp.* v. *R. R. Commission* (1915) 169 Cal. 466, 475 [147 P. 118].) The Commission must place the important public policy in favor of free competition in the scale along with the other rights and interests of the general public. Here, the Commission did not perform this task; it incorrectly found "no need to determine the issues raised by NCPA."

Both the Commission and PG&E attempt to justify the decision below by arguing that the PG&E contracts were not before the Commission for approval and that they were merely collateral to the main proceeding. It is doubtless true, as an abstract proposition, that at some point the antitrust implications of a project may become so remote from its central objective that they may be disregarded. This is not such a case. Indeed, here the antitrust problems are apparent on the face of PG&E's application, which incorporates the contracts themselves as exhibits. These agreements are obviously of the greatest importance to the proposed units 7 and 8, for without the steam furnished under them, the turbines would never operate.

Furthermore, units 7 and 8 are the first to utilize steam under these contracts and will fulfill PG&E's obligation to build 100 megawatts of additional capacity for use in 1972. Where such a close nexus exists between the construction to be approved by the Commission and a contract presenting antitrust problems, the Commission cannot ignore the antitrust factors on the ground that they are collateral to the issue of public convenience and necessity.

PG&E and the Commission also seek to excuse the Commission's failure to consider NCPA's claims by contending that NCPA's plans for establishing a geothermal steam-electric generating plant are vague and speculative. ■ The evidence on this point is in conflict, and we are therefore bound by the Commission's third finding of fact, which is that "NCPA's concern re steam supplies is based upon vague and speculative proposals." (Pub. Util. Code, § 1757; *Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 362 [260 P.2d 70], app. dism. (1954) 346 U.S. 919 [98 L.Ed. 414, 74 S.Ct. 313].) Nevertheless, the vagueness of NCPA's plans does not excuse the Commission's failure to consider the antitrust issues raised. As we have indicated above, the public interest in preventing monopolies is one facet of the larger public convenience and necessity which the Commission was established to protect. ■ The Commission may and should consider *sua sponte* every element of public interest affected by facilities which it is called upon to approve. ■ It should not be necessary for any private party to rouse the Commission to perform its duty, and where a private party has so clearly demonstrated the adverse impact of the proposed facilities, the Commission certainly cannot ignore the problem simply because it was not raised by one having impeccable credentials of legal standing. (*Marine Space Enclosures, Inc.* v. *Federal Maritime Com'n* (1969) 420 F.2d 577, 585, 591-592 [137 App.D.C. 9].)

■ Thus, we conclude that the Commission failed to give adequate consideration to the antitrust issues presented by NCPA in the instant proceedings, and that its decision must be annulled.

Even if we were to assume, as the Commission and PG&E contend, 'that the Commission did in fact take into account the antitrust problems, we would still be compelled to annul the decision because of the Commission's obvious failure to make appropriate findings. As we have often said, the Commission must make specific findings of fact and conclusions of law relevant to all material issues of a case. Here, there are no findings of fact which could possibly be construed as dealing with antitrust considerations. There is no definition of relevant market, no determination of effect upon competition, no finding as to the reasonableness of any restraint. Nor can the Commission's finding that "[u]ndisputed evidence demonstrates the

need for the new electric generation to be provided by Geyser's Units Nos. 7 and 8" serve as a substitute. As we recently said: "The ultimate finding of public safety, welfare, convenience and necessity does not meet the requirements of section 1705 of the Public Utilities Code. Every issue that must be resolved to reach that ultimate finding is 'material to the order or decision,' and under section 1705 separately stated findings are required of the basic facts upon which the ultimate finding is based. The requirements and the reasons therefor have been repeatedly emphasized by this court." (*Southern Pacific Co.* v. *Public Utilities Com.* (1968) 68 Cal.2d 243, 244 [65 Cal.Rptr. 737, 436 P.2d 889].)

By our decision herein we do not intend to intimate any view on the merits of NCPA's claim that PG&E's steam supply contracts violate the antitrust laws. Nor do we hold that the Commission must deny PG&E's application if it determines that the contracts violate those laws. The Commission may conclude that the public interest as a whole is better served by the construction of units 7 and 8 under the present contracts than under other possible conditions, even if it finds that the contracts do adversely affect the public interest in free trade. We merely hold that the Commission must consider all of these questions and must express its findings and conclusions specifically as to each of the material issues raised.

The decision is annulled.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Kaus, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.