[S.F. No. 23581. Oct. 27, 1978.]

INDUSTRIAL COMMUNICATIONS SYSTEMS, INC., et al.,
Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
GENERAL TELEPHONE COMPANY OF CALIFORNIA,
Real Party in Interest.

574

## Counsel

Warren A. Palmer for Petitioners.

Janice E. Kerr, Hector Anninos, Scott K. Carter, Sheldon Rosenthal and Philip Scott Weismehl for Respondent.

Albert M. Hart, H. Ralph Snyder, Jr., and Kenneth K. Okel for Real Party in Interest.

## OPINION

NEWMAN, J.—In May 1974, pursuant to Public Utilities Code sections 489 and 491,[1] General Telephone Company of California (General Telephone) filed with the Public Utilities Commission (Commission) certain changes in its tariffs for mobile telephone service. Rates were proposed for one-way radio-paging service in the Redlands/San Bernardino area. General Telephone previously had not offered that service in the area.[2]

Involved here is a one-way radio-paging technique that permits a customer in transit to be contacted by someone at a stationary telephone. The stationary individual dials into the paging terminal an assigned, four-digit code number. A signal is transmitted by radio to the transiting person, who receives it as a tone emitted from a portable receiver. Two-way mobile service, which General Telephone already was providing in the area, also uses radio transmissions. It permits two-way voice communication rather than the simpler, one-way tone paging involved in General Telephone's proposed tariff modifications here.

Protests against the proposed modifications were filed with the Commission by two radiotelephone utilities (RTUs).[3] They provided

---

[1] Section 489 provides that "every public utility other than a common carrier shall file with the commission . . . schedules showing all rates . . . to be collected or enforced. . . ."

Regarding changes, section 491 provides: "Unless the commission otherwise orders, no change shall be made by any public utility in any rate . . . except after 30 days' notice to the commission and to the public. Such notice shall be given by filing with the commission and keeping open for public inspection new schedules stating plainly the changes to be made. . . ."

[2] General Telephone already provided one-way paging in the adjacent Pomona/Ontario area; the Redlands/San Bernardino service would be coordinated with that one, so that a customer could be paged in both areas simultaneously. General Telephone also provided two-way mobile service in the Redlands/San Bernardino area and wireline service in much of both areas.

[3] When first ruling, in 1961, that radiotelephone utilities are subject to its jurisdiction the Commission stated: "For administrative purposes, to differentiate between those telephone utilities conducting a general wireline business within the State of California and those utilities conducting such business principally or exclusively by radio, the latter

similar service in the area, and they requested that General Telephone's one-way service not be allowed to go into effect. The Commission suspended the new tariffs and instituted an investigation.[4] After several days of hearings, the Commission decided to end the investigation and to permit General Telephone to institute the proposed rates for its one-way paging (Dec. No. 86402, Case No. 975 (1976) 80 Cal.P.U.C. 503). It denied rehearing and reconsideration in Decision No. 86706 (1976) 80 Cal.P.U.C. 787.

Three RTUs requested review here. They allege (1) that the Commission's decision is unlawful because it permits General Telephone to extend its service without certification, and (2) that the Commission exceeded its authority when it investigated but did not adequately consider the anticompetitive aspects of the proposed service.[5] We agree with the complainants as to both contentions.

## I. *Certification*

Public Utilities Code section 1001 provides that, before a telephone corporation "begin[s] the construction of . . . a line, plant, or system, or of any extension thereof," the Commission must certify that "the present or future public convenience and necessity require or will require such construction."

General Telephone's proposed service requires (1) expansion of its terminal facilities in Pomona to accept up to 1,000 pager numbers (compared with the present 770 capacity), (2) installation of a new transmitter in Redlands, and (3) two foreign exchange lines for access to the Pomona terminal. The Commission found that "relatively little additional plant is required in order to institute the new service." The minimal construction needed for expansion apparently is peculiar to radiotelephone service. (See *Loperena* v. *Fresno Mobile Radio, Inc.* (1970)

---

group will be referred to hereinafter as radiotelephone utilities." (Dec. No. 62156 (1961) 58 Cal.P.U.C. 756, 759.)

[4]The Commission stated it was investigating to determine "whether said tariff sheets are unreasonable or unlawful in any particular and to issue any order or orders that may be lawful and appropriate in the exercise of the Commission's jurisdiction in the premises."

[5]Public Utilities Code section 1756 contemplates Supreme Court review "for the purpose of having the lawfulness of the original order or decision . . . inquired into and determined." Section 1757 provides: "The review shall not be extended further than to determine whether the commission has regularly pursued its authority. . . ."

71 Cal.P.U.C. 645, 649: "It is technically practicable for an RTU offering selective two-way mobile communication to add one-way paging service throughout its two-way service area without any necessary additions to its transmitting equipment. . . .")

■■ The RTUs contend that, even with minimal construction, General Telephone must obtain certification before offering the new service in Redlands/San Bernardino. Unless certificated, they say, the new service would be unlawful. General Telephone answers that the new service is exempted by these words of section 1001: "This article shall not be construed to require any such corporation to secure such certificate . . . for an extension within or to territory already served by it, necessary in the ordinary course of its business."

The Commission found that General Telephone now furnishes two-way mobile service throughout the Redlands/San Bernardino area where one-way service is proposed. It concluded that no certificate was needed because, under section 1001, the new service would constitute an "extension within or to territory already served . . . , necessary in the ordinary course of . . . [General Telephone's] business."[6] The RTUs respond that certification nonetheless is necessary because the existing two-way service has never been certificated and thus itself is unlawful. Before the exception in section 1001 may be applied the lawfulness of the existing service should be shown.

At oral argument Commission counsel stated that General Telephone's two-way service in the area has been certificated. If so the company does lawfully provide that service and, under section 1001, may provide the new service without further certification. (*Loperena, supra.*) But nothing in the Commission opinion, record, or briefs indicates that the two-way service has been certificated; and, though we asked, the Commission has not provided us with a copy of any certification. We therefore examine the question of lawfulness assuming, as the Commission apparently did in its own opinion, that the two-way service never was certificated.

---

[6]In *Loperena* v. *Fresno Mobile Radio, Inc.* (1970) 71 Cal.P.U.C. 645 the Commission held that signaling service concentric with existing, lawful two-way service requires no further certification because it is an extension "necessary in the ordinary course of business." The public interest thus is enhanced because mobile and paging services use the same equipment and personnel, resulting in lower costs and more efficient choice of service. (*Id.,* at p. 650.)

The Commission decided here that certification was not required for the two-way service because it covered territory already served by General Telephone's wirelines.[7] It found that "[t]he word 'territory' as used in that part of section 1001 of the Public Utilities Code reading '. . . extension within or to territory already served by it, necessary in the ordinary course of its business. . .' can and should denote, for mobile radiotelephone service by a land line telephone utility, that service area delineated by an appropriate signal strength contour which provides reasonable coverage of its pertinent exchanges *and such adjacent area as necessary to provide a rational contour.*" (Italics added.)[8]

Using that definition the Commission concluded that General Telephone's uncertificated mobile service is lawful, even though the signal covers not only part of its own wireline area but also part of several Pacific Telephone and Telegraph Company exchanges. The Commission explained that "radio signals . . . cannot be arbitrarily confined to the fixed boundaries of telephone exchanges" and that section 1001 was "designed for classes of utilities with fundamentally different physical and operating characteristics than those of utilities in the radio communications field."

Because no special statutory scheme has been devised for radiotelephone communications, the Commission applies statutes not tailored to the new technology. *Loperena, supra,* 71 Cal.P.U.C. 645, was a case in which the Commission struggled to find a way to accommodate the physical and economic characteristics of radiotelephone service to the words of section 1001. Because it found the statute inadequate to provide uniform regulation of two-way radiotelephone expansion into one-way service, it applied the words in such a way as to remove completely such expansion from any regulation. In this case the Commission again adopted an interpretation that removes radiotelephone expansion from

---

[7]In *Malis* v. *General Telephone Co.* (1961) 59 Cal.P.U.C. 110 the Commission decided that mobile service by a wireline company within territory already served by wirelines did not require certification under section 1001.

[8]The contour of a radio signal defines the area in which the signal can be received. The Commission has adopted the Federal Communications Commission (FCC) standard that locates the contour where a signal can be received at a certain strength (Dec. No. 62156 (1961) 58 Cal.P.U.C. 756, 760, approving the standard in FCC Rules part 21.504; Dec. No. 88513 (1976) pp. 8-9, adopting the revised FCC standard in part 21.504 (47 C.F.R. § 21.504)). The size and shape of the area so defined vary with such factors as the location, elevation, and power of the transmitter and the geography of the area (see, e.g., *Industrial Communications Systems, Inc.* v. *R. L. Mohr* (1975) 79 Cal.P.U.C. 110, 119, 122).

regulation. But the reasons the Commission cited for its *Loperena* interpretation do not apply here. There, when mobile service expanded to include concentric paging service, additional construction would not always be necessary. Further, efficiency and economy would be furthered by having the same supplier offer both services, using the same equipment and personnel. In contrast, when a wireline service expands to include mobile service, construction is typical rather than atypical; and the same equipment and personnel are not necessarily used. Also, *Loperena* concerned a new service concentric with and entirely within the existing service area, while the mobile service area here is quite different in size and shape from the original service. The Commission's interpretation here appears to exempt from certification an indefinite amount of radiotelephone expansion by wireline companies. It permits uncertificated expansion into "such adjacent area as necessary to provide a rational contour" but does not indicate any limit to the size of a "rational contour." Complainants state that the radio contour area here is three times larger than General Telephone's wireline area.[9] The ratio of a radio contour area to a wireline area apparently could depend on the shape and size of the wireline exchange and the location of the transmitting tower within it, as well as the shape and size of the contour itself (see fn. 8, *ante*). Without limits on "a rational contour" the Commission's definition seems to be not an interpretation but rather a contradiction of the words of section 1001, resulting in partial deregulation (cf. *Pacific Tel. & Tel. Co.* v. *So. Pacific Communications Co.* (1974) 78 Cal.P.U.C. 123, 126-128).[10]

The Commission emphasizes that wireline boundaries cannot accurately describe or confine a radiotelephone service area. We disagree with the Commission's conclusion that therefore all General Telephone's radiotelephone service area exceeding its wireline boundaries should be treated for certification purposes as if it were within those boundaries. On the contrary, new service to a large area that is more than incidentally outside the authorized service boundaries should be considered an extension by the wireline company into territory not already served by it. Otherwise, as this case illustrates, new service will be permitted in

---

[9] A map in the exhibits seems to show a lesser but still significant difference.

[10] Radio signals cannot be conformed exactly to the shape of a wireline exchange. We note, however, that the Commission has authorized radiotelephone service contours that, unlike this one, include only minor variations from otherwise required boundaries (e.g., "a nonessential portion," Dec. No. 85955 (1976) p. 5; "approximately co-terminus with the boundaries of the [wireline exchanges]," *Industrial Communications Systems, Inc.* v. *Pomona Radio Dispatch Corp.* (1973) 75 Cal.P.U.C. 433, 438).

previously unserved territory without certification, in contradiction of the clear mandate of section 1001.[11]

· To require certification for wireline utilities' initial radiotelephone extension into new territory does not reject the Commission policy of fostering limited competition between wireline utilities and RTUs. (*Malis v. General Telephone Co., supra* (1961) 59 Cal.P.U.C. 110, 115-116; see also Dec. No. 85356 (1976) 79 Cal.P.U.C. 404, 457-458; the FCC's *Guardband Proceeding* (1968) 12 F.C.C.2d 841, recon. den. 14 F.C.C.2d 269, affirmed *sub. nom., Radio Relay Corporation v. F.C.C.* (2d Cir. 1969) 409 F.2d 322.) But the competition should be allowed only after a commission determination of public convenience and necessity. In making that determination the Commission would consider factors related to the beneficial effect of competition (e.g., adequacy of existing service). (Dec. No. 85356 (1976) 79 Cal.P.U.C. 404, 428; *Silver Beehive Telephone Co.* (1970) 71 Cal.P.U.C. 304, 307.) Indeed, as we discuss below, the Commission is required in certification proceedings to consider competition as an element of the public interest.

■■ In this case the Commission's approval of the tariffs did seem to resemble a certification decision. While it did not make a finding of or issue a certificate of public convenience and necessity, it did find the service to be in the public interest after discussion of several factors that also would be required in making a certification decision.

Complainants maintain, though, that by avoiding a certification proceeding General Telephone avoided "the procedural and substantive guidelines prescribed by the Commission." One significant difference between a certification proceeding and this one is that in the former determination of public convenience and necessity is required. Here, though, the Commission analyzed facts that happen to be relevant to certification only because a complaint by competitors led to an investigation. Further, in a certification proceeding the burden is on the applicant to show that the public convenience and necessity require the proposed service.[12] Here the burden was on complainants. In addition, the Commission's rules require that a certification application include

---

[11]This decision concerns only radiotelephone service by wireline companies and does not address the Commission's earlier ruling that an RTU's radiotelephone service area should not be described or restricted by the boundaries of a wireline company's exchange (*Radio Dispatch Corp.* (1975) (Dec. No. 84819)).

[12]Decision No. 85356, *supra*, 79 Cal.P.U.C. 404, 428.

information that was not included in the tariff letters here because certification was not requested (names of prospective competitors, maps, facts showing public convenience and necessity, etc.; see Cal. Admin. Code, tit. 20, § 18).

 We conclude that the Commission exceeded its authority by permitting General Telephone's tariff changes. Because the extensive two-way mobile service outside the wireline exchange boundaries is unlawful without certification, the proposed one-way service in the same area without a certification hearing also would be unlawful.

## II. *Issues as to Competition*

 Complainants contend that the Commission improperly excluded evidence of a regional plan, agreed to by General Telephone and Pacific Telephone, to provide paging service jointly and separately throughout southern California. They offered the evidence to show possible antitrust and anticompetitive effects of General Telephone's new service.

"It is no longer open to serious question that in reaching a decision to grant or deny a certificate of public convenience and necessity, the Commission should consider the antitrust implications of the matter before it." (*Northern California Power Agency* v. *Public Util. Com.* (1971) 5 Cal.3d 370, 377 [96 Cal.Rptr. 18, 486 P.2d 1218].) Even if the matter were not treated as a certification proceeding, the Commission agrees that it had a duty to consider anticompetitive factors as an element of the public interest affected by the new service. By excluding evidence of a plan the Commission here seems to have failed to fulfill that duty.

Complainants sought to introduce evidence of the regional plan to show that Pacific Telephone and General Telephone had agreed to supply radiotelephone service jointly in some areas and to divide other areas between them. The Redlands/San Bernardino area at issue here allegedly was among the areas to be divided.

The Commission offers several reasons for excluding the evidence. *First,* it relies on Commission and FCC policies to favor competition between wireline companies and RTUs. (*Malis* v. *General Telephone Co., supra,* 59 Cal.P.U.C. 110.) *Malis,* however, did not imply that competition between wireline companies and RTUs should be promoted by eliminat-

ing competition between the wireline companies themselves. *Second,* the Commission explains that the plan here is too broad to be relevant because (1) this proceeding is limited to a small geographical area; (2) the paging service would not be provided jointly with Pacific Telephone but only by General Telephone; and (3) there is no evidence of an agreement that Pacific Telephone would refer its customers in the area to General Telephone. That reasoning ignores the possibility that General Telephone's exclusive presence in the Redlands/San Bernardino market is the result of an agreement to divide the market. *Finally,* the Commission contends that the evidence should have been introduced in another case pending at the time, involving the Los Angeles area, where anticompetitive factors were material issues. That those issues may have been material in another case does not justify excluding the evidence here. The agreement allegedly concerned the entire southern California paging market. That the other case involved a larger area and a joint service does not explain refusal to consider the plan in reference to a smaller area where allegedly the plan stated that only one wireline company would provide service.

We note that *Northern California Power, supra,* requires consideration of antitrust issues where "a close nexus exists" between the construction to be approved by the Commission and an agreement presenting antitrust problems. (5 Cal.3d at p. 380.) In line with that decision the Commission in other cases has limited the scope of investigation (to avoid delays in needed facilities) by excluding "antitrust implications [that] have only tangential impact on the primary matter before the Commission." (Dec. No. 81186 (1973) 75 Cal.P.U.C. 101, 114, mod. in Dec. No. 81422 (1973) 75 Cal.P.U.C. 227.) While some evidence offered here may have been tangential, the evidence of an agreement including the Redlands/San Bernardino area does seem closely related to General Telephone's expansion into that area.

As for evidence on the joint plan that was admitted, the Commission's opinion does not analyze the issues raised. ■ This court stated in *Northern California Power, supra,* 5 Cal.3d at 379, "The task of the Commission extends far beyond the passive role of a sounding board. The Commission cannot discharge its duty by merely taking 'cognizance [of the evidence]' without evaluating [its] effect upon the interests of the public. It must weigh the opposing evidence and arguments in order 'to determine whether the rights and interests of the general public will be advanced by the prosecution of the enterprise which it is proposed to

carry on for the service of the public.' (*Oro Electric Corp.* v. *R. R. Commission* (1915) 169 Cal. 466, 475 [147 P. 118].)" The Commission must also make findings of fact and conclusions of law relevant to all material issues. (5 Cal.3d at p. 380.)

 Here the Commission looked only for evidence as to practices by General Telephone in the Pomona/Ontario/Redlands/San Bernardino area, and it ignored the regional plan issue. While the plan itself was excluded, two internal General Telephone memos on the proposed service in the limited area were admitted (one stating, "Deviation from the Personal Signaling Service Fundamental Plan for the Southern California Region has not been concurred in by PT&T;" the other noting that "it will be necessary to negotiate a revision to the Personal Signaling Fundamental Plan which depicts frequency allocation and is presently concurred in by both PT&T and General Companies"). A material issue as to anticompetitive effect in the Pomona/Ontario/Redlands/San Bernardino area seems clearly raised by such evidence, but the Commission did not fulfill its duty to address that issue. Its discussion of the overall, beneficial effects of competition between RTUs and General Telephone did not take into account how that competition might be affected by the regional plan.

We hold that the record here does not support the Commission's interpretation and application of the "territory already served" exception in section 1001. Further, approval of General Telephone's paging service was unlawful because the Commission did not consider and make findings on the anticompetitive effect of any agreement not to compete in that area. However, we express no opinion as to whether such an agreement in fact would have an anticompetitive effect or whether notwithstanding that effect the proposed service would still be in the public interest.

The decisions are annulled.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Manuel, J., concurred.

The petition of the real party in interest for a rehearing was denied November 30, 1978.