[S.F. 24165. July 6, 1981.]

UNITED STATES STEEL CORPORATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent.

606

## COUNSEL

McCutchen, Doyle, Brown & Enersen, John N. Hauser, Andrew J. Wistrich, Wayne L. Emery and Kenneth R. Pepperney for Petitioner.

Janice E. Kerr, Hector Anninos and Scott K. Carter for Respondent.

## OPINION

**NEWMAN, J.**—The Public Utilities Commission sets minimum rates for intrastate transportation of commodities by highway carriers. Though federal authorities control intrastate motor carrier movement that precedes or follows import or export by *common carrier* vessel, it is undisputed that the commission has jurisdiction over wholly intrastate movement preceded or followed by movement in foreign commerce via *private* vessel.[1]

---

[1] The commission only recently determined that it had jurisdiction to regulate private-vessel commodities. Because truckers assumed that federal authorities had jurisdiction, they had been using federal rates.

In Decision 90802 the commission exempted private-vessel commodities from its motor carrier minimum rate regulations. The exemption principally applies to imports of manufactured steel, newsprint, paper, and salt and exports of scrap iron, steel, and wood chips. In this proceeding United States Steel challenges Decision 90802 insofar as it affects imported steel.

The trucking rates charged for most products subject to federal regulation are substantially below the minimum rates set by the commission. Apparently the greatest disparity exists in the carriage of steel, with state minimum rates ranging from 40 to 63 percent above federal rates. The exemption of private-vessel steel from state rates would mean that foreign steel would be carried at the lower federal rates.[2]

There was no evidence of economic justification for the rate disparity or of a difference in cost for the transportation of foreign and domestic steel. So far as appears, a trucking company may haul both foreign and domestic steel; and it was suggested that one truck may haul both at the same time, with favorable rates for the foreign steel. The percentage of the California market supplied by foreign steel has increased in recent years, reaching more than 40 percent in 1978. More than half of many steel products consumed in California are imported.

A staff investigation revealed that most motor carriers did not know whether prior or subsequent shipping was by common carrier or private vessel. Most carriers felt that to determine whether commodities traveled by private vessel would be burdensome or impossible. They had been assessing federal rates for all port traffic believed continuous, without determining whether vessel transportation was by common carrier or private vessel.

The commission found that determining whether a motor carrier shipment had a prior or will have a subsequent movement in a private vessel is "difficult" with respect to manufactured iron and steel articles, newsprint, paper, and iron and steel scrap.

---

[2]There is little evidence of the relation between transportation differentials and the prices of delivered foreign and domestic steel. One witness said the freight-rate differential was a "minor" part of the price of hot-rolled rods, for instance.

There also was testimony that one-fourth of domestic steel travels by rail and that rail rates are lower than minimum truck rates. The difference was not stated, but the witness said that rail rates are "still high" in comparison with trucking rates for foreign steel.

With respect to contentions that exemption would give foreign producers an improper advantage the commission recognized that domestic producers of steel "may be adversely affected" if foreign producers are permitted rates below the California minimum. It stated that the extent of the advantage "is not a material fact in this proceeding inasmuch as it is not the function or duty of this commission to attempt to allocate markets between competing producers, or to equalize variations in production and distribution costs of different producers of the same commodity through the establishment of freight rates on that commodity."

## ECONOMIC IMPACT ON SHIPPERS

California Constitution, article XII, section 3 authorizes the commission to fix rates for transportation of property by carriers. Public Utilities Code sections 726 and 3662[3] vest in the commission discretion to set minimum rates, maximum rates, or no rates at all. (*California Trucking Assn.* v. *Public Utilities Com.* (1977) 19 Cal.3d 240, 246-248 [137 Cal.Rptr. 190, 561 P.2d 280].)

Section 3662 requires that rates be "just, reasonable, and nondiscriminatory," and that in "establishing or approving such rates the commission shall give due consideration to the cost of all of the transportation services performed . . . the value of the commodity transported, and the value of the facility reasonably necessary to perform the transportation service."

In *California Trucking Assn.* v. *Public Utilities Com., supra,* 19 Cal.3d 240, 247, we recognized that refusal to impose minimum rates was permissible when the record failed to demonstrate "an obvious or persuasive need in the public interest" or that "the rates would not have a meaningful effect on the transportation involved." In addition we stated that exemption from rates could be justified when "the exemption would not lead to destructive rate practices."

■ Concomitant with the discretion conferred on the commission is the duty to consider all facts that might bear on exercise of that discretion. The commission must consider alternatives presented and factors warranting adoption of those alternatives. (*City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 693-695 [125 Cal.Rptr. 779,

---

[3]Unless otherwise indicated all statutory references are to the Public Utilities Code.

542 P.2d 1371]; *City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798].) That duty is inherent in the requirement that the decision "contain, separately stated, findings of fact and conclusions of law . . . on all issues material to the order or decision." (§ 1705; *Industrial Communications Systems, Inc.* v. *Public Utilities Com.* (1978) 22 Cal.3d 572, 583 [150 Cal.Rptr. 13, 585 P.2d 863]; *City of Los Angeles* v. *Public Utilities Com., supra*, 15 Cal.3d 680, 694; *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 274-275 [28 Cal.Rptr. 868, 379 P.2d 324].) Since here the commission refused to consider the economic effects of different rates on shippers, the question is whether those effects are material to the exercise of discretion.

This court has recognized that the commission must consider the economic effects of alternative rules. Because it "may and should consider *sua sponte* every element of public interest affected by facilities which it is called upon to approve," the commission must, for example, consider antitrust implications of contracts of a utility that seeks a certificate of public convenience and necessity for construction and operation of geothermal, steam-electric generating units. (*Northern California Power Agency* v. *Public Util. Com.* (1971) 5 Cal.3d 370, 380 [96 Cal.Rptr. 18, 486 P.2d 1218]; see *Industrial Communications Systems, Inc.* v. *Public Utilities Com., supra*, 22 Cal.3d 572, 582-583.) When special devices are required by telephone companies for connection of privately manufactured devices that may be competitive with similar utility devices, the commission must carefully weigh competitive factors. (*Phonetele, Inc.* v. *Public Utilities Com.* (1974) 11 Cal.3d 125, 132 [113 Cal.Rptr. 16, 520 P.2d 400].) There is no duty to allocate markets among competing producers, but there is a duty to consider economic effects of alternative approaches.

The commission urges that, by requesting minimum rates to remedy assertedly unfair foreign competition, U.S. Steel is proposing state interference into realms of foreign commerce exclusively reserved to Congress. But the commission itself has proposed special exemption for foreign steel transportation subject to its jurisdiction. Its position thus may be anomalous—recognizing and denying jurisdiction at the same time.[4]

---

[4]The commission also contends that no evidence discloses the extent to which domestic steel producers would be prejudiced by the exemption, but it did not base the exemption on this ground. Its ruling was that such evidence is not material.

■ When as in this case it appears that exemption from regulation will result in giving some commodity shippers an advantage over others using the same or similar vehicles and routes, the commission should assess the economic impact of its action. If exemption would have the effect of driving shippers out of business (with attendant loss of jobs) that result would be material and conceivably could be controlling. Since the commission here refused to consider the impact of its exemption, Decision 90802 must be annulled.

DISCRIMINATORY RATES

It is also urged that the exemption is discriminatory in violation of statute and constitution. To guide the commission in further proceedings, we briefly discuss the question.

A. *Statute*

"The primary purpose of the Public Utilities Act ... is to insure the public adequate service at reasonable rates without discrimination." (*Pac. Tel. & Tel.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822, 826 [215 P.2d 441].) In addition to the requirement in section 3662 that rates be nondiscriminatory (see above), section 453 provides: "(a) No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation to any prejudice or disadvantage.... [¶] (c) No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service ...."

■ Discrimination in rates may be evidenced by differentials for nearby localities when operating conditions are substantially the same. (*Cal. Portland Cement Co.* v. *Public Util. Com.* (1957) 49 Cal.2d 171, 175 [315 P.2d 709].) Here the commission reasoned that section 453 and *Cal. Portland Cement Co.* are inapplicable for two reasons. First, that case involved a single carrier whereas here an unknown number of carriers transport steel; and it is urged that section 453 is not violated by rate difference when different carriers are involved. Second, that case involved fixed rather than minimum rates; and highway carriers may and do charge in excess of the minimum when conditions permit.

■ While section 453 provides that no public utility may grant preferences, the evidence here fails to show that trucking companies will not grant preferences based on the exemption. So far as appears a single company may and does transport both domestic and private-vessel steel; and (as noted above) there was evidence that a single truck might haul both at the same time, with favorable rates for the private-vessel steel.

Applying minimum rates to some but not all steel—like applying fixed rates to some but not all steel—results in a preference for suppliers of unregulated steel and constitutes a rate difference between localities when, as here, it appears that rates for exempt transportation will be substantially below the minimum. Section 453 and *Cal. Portland Cement Co.* are applicable, and—because exemption results in preference, disadvantage, and prejudice—a violation is established unless it can be shown that the exemption is reasonable.

The parties have cited no judicial decision determining whether factors involved here warrant rate differentials under section 453. It is argued, though, that in any case the exemption would effect invidious discrimination that denies equal protection.

### B. *Constitution*

Petitioner claims there is no rational basis for the classification of private-vessel and domestic steel. The commission found: (1) Refusal to exempt private-vessel steel would result in higher transportation costs. (2) Minimum rates had not previously been applied to private-vessel steel because it had been assumed subject to federal regulation. (3) It is difficult to determine whether foreign steel was transported in private or in common carrier vessels.

"The constitutional bedrock upon which all equal protection analysis rests is composed of the insistence upon a rational relationship between selected legislative ends and the means chosen to further or achieve them. This precept, and the reasons for its existence, have never found clearer expression than the words of Justice Robert Jackson, uttered 30 years ago. 'I regard it as a salutary doctrine,' Justice Jackson stated, 'that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants *except upon some reasonable differentiation fairly related to the object of regulation.* This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no

more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.' (*Railway Express* v. *New York* (1949) 336 U.S. 106, 112-113 [93 L.Ed. 533, 540, 69 S.Ct. 463] (Jackson, J., conc.), italics added.) (See also *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 131-132 [216 P.2d 825, 13 A.L.R.2d 252], discussed *post.*) [¶] It is with these principles firmly in mind that we have undertaken to assess the classification here before us. In so doing our function is, as we have recently indicated, 'to conduct "a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals" [citation]; . . .' (*Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].) The most that we require of that correspondence is that it be *rational*—i.e. that, in the words of Justice Jackson, the classification be found to rest upon 'some reasonable differentiation fairly related to the object of regulation.'" (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 786-787 [160 Cal.Rptr. 102, 603 P.2d 19].)

█ The aim of minimum rate regulation is to preclude destructive rate practices and to provide for movement at the lowest rates compatible with the maintenance of adequate transportation service. (*California Trucking Assn.* v. *Public Utilities Com., supra*, 19 Cal.3d 240, 247; *Cal. Mfrs. Assn.* v. *Public Utilities Com.* (1954) 42 Cal.2d 530 [268 P.2d 1].) Rates below the minimum do not serve that aim absent some showing of a difference in cost in hauling private-vessel steel as compared with domestic steel, or of a difference regarding destructive rate practices. There is no showing here. The goal of lower rates might justify total elimination of rate regulation, but it does not justify harmful classification.

The second proposed justification—the tradition of not applying minimum rate regulation to private-vessel steel—does not by itself justify the classification. The reason for the traditional exemption, exclusive federal jurisdiction (see fn. 1), has evaporated. While grandfather clauses have been upheld in a variety of statutes (*New Orleans* v. *Dukes* (1976) 427 U.S. 297, 304-305 [49 L.Ed.2d 511, 517, 96 S.Ct. 2513]; *In*

*re Norwalk Call* (1964) 62 Cal.2d 185, 188 [41 Cal.Rptr. 666, 397 P.2d 426]) legislation that favors existing business must have a reasonable relation to the public interest. For example, the fact that a company had been in business prior to regulation may furnish a basis for exemption from a licensing statute designed to assure competency. (*Accounting Corp.* v. *St. Bd. of Accountancy* (1949) 34 Cal.2d 186, 190 [208 P.2d 984].) And a grandfather clause may serve the purpose of avoiding inequities that might result to those who prior to the adoption of the regulatory scheme had already established a business. Minimum rates do not relate to competency, however; and it is not shown that California trucking companies will be unable to compete if required to observe the minimum rates.

Where a grandfather clause does not appear to relate to the public interest the statute may offend constitutional protection against arbitrary classification. (*Accounting Corp.* v. *St. Bd. of Accountancy, supra*, 34 Cal.2d 186, 191; see *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1964) 61 Cal.2d 305, 310 [38 Cal.Rptr. 409, 392 P.2d 1].) Administrative classifications enjoy no greater immunity from challenge than do statutes, and exemptions may not be justified on the basis of tradition alone.

The third argument for the exemption—difficulty in determining whether imported steel has arrived via common carrier or private vessel—involves the burden on truckers in determining the appropriate rate as well as on the commission in enforcing minimum rates.

■ A legislative body addressing a particular area need not attack all problems at once but generally may address one or more, pursuant to perceived priorities. Yet in striking the evil where it is felt most the lawmakers may not be capricious; again, their decision must have a rational basis in light of the objectives. (*Hays* v. *Wood, supra*, 25 Cal.3d 772, 790-791.)

■ The commission has wide discretion to prescribe rate classifications that reflect a varied range of economic classifications. (*Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 294-295 [93 Cal. Rptr. 455, 481 P.2d 823].) Administrative convenience may be given weight, and equal protection is not denied merely because classifications made are imperfect. "'If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in

some inequality." *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61, 78 .... "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co.* v. *City of Chicago*, 228 U.S. 61, 69-70.'" (*Id.*, at p. 295, fn. 2; *Dandridge* v. *Williams* (1970) 397 U.S. 471, 485-487 [25 L.Ed.2d 491, 501-503, 90 S.Ct. 1153].)

Under *Wood* and *Dandridge*, administrative convenience will justify imprecision when the classification is roughly related to the objective. Nonetheless there is some authority to the effect that convenience by itself does not justify classification. In *Reed* v. *Reed* (1971) 404 U.S. 71, 76-77 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251], a statute granting males a preference in administering estates was invalidated though it was recognized that by eliminating hearings on the merits the statute would reduce the probate workload. In *Carrington* v. *Rash* (1964) 380 U.S. 89, 96 [13 L.Ed.2d 675, 680, 85 S.Ct. 775] a statute denying servicemen the right to vote was invalidated notwithstanding that determining the eligibility of servicemen to vote was difficult.

Determining whether foreign steel is transported by common carrier (so that federal rates apply) or by private vessel (so that the commission has jurisdiction) could be a burden not only on the commission but also on truckers. In our view, though, the commission's finding as to "difficulty" seems inadequately supported by the record. Without a more complete record, neither the constitutional nor the statutory issues can be settled.

CONCLUSION

We conclude that the commission erred in refusing to consider economic impact and in detecting too much "difficulty."

Decision 90802 is annulled.

Bird, C. J., Mosk, J., Richardson, J., Feinberg, J.,* Kongsgaard, J.,* and Abbe, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.