[S.F. No. 22979. In Bank. Apr. 8, 1974.]

PHONETELE, INC., Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
GENERAL TELEPHONE COMPANY OF CALIFORNIA et al.,
Real Parties in Interest.

**COUNSEL**

Sigelman & Stein, Rick M. Stein and Paul S. Sigelman for Petitioner.

John P. Mathis, J. Calvin Simpson and Scott K. Carter for Respondent.

Albert M. Hart, H. Ralph Snyder, Jr., Donald J. Duckett, James A. De-
Bois, Robert E. Michalski and Milton J. Morris for Real Parties in Interest.

**OPINION**

**MOSK, J.**—Petitioner, Phonetele, Inc., seeks review of decision No. 80247
of the Public Utilities Commission (Commission).

Phonetele manufactures a device known as the Phonemaster 1040, which
restricts outgoing telephone calls to selected area codes or exchange pre-
fixes. Decision No. 80247 determines that the Phonemaster may not be
connected to a telephone without the installation of a protective connection
provided exclusively by defendant utilities, General Telephone Company
of California (General) and Pacific Telephone and Telegraph Company
(Pacific). There is a charge of $24 to install the connection and a $1.80 a
month service charge, thereby increasing the cost to a telephone sub-
scriber who proposes to use the Phonemaster.[1] Phonetele asserts that the

---

[1]By subsequent decision, we are now advised, the utilities were ordered by the
Commission to supply the protective interface to Phonetele customers without charge.

evidence was insufficient to demonstrate direct connection of the Phonemaster presents a hazard to the telephone system as a whole, that only a finding of potential harm to the system was made and such a finding is insufficient to justify the Commission's order, and that the Commission failed to make proper findings on the antitrust issues involved.

As indicated *infra,* we hold that the decision must be annulled because the Commission did not employ appropriate standards in determining that the protective connection device provided by the utilities is "necessary." That is, the Commission declared only that absent the connection device, "problems which can presumably be corrected . . . *could* arise from the design, manufacture, installation and maintenance of the Phonemaster." (Italics added.) This equivocal assertion cannot support its conclusion of necessity.

Prior to 1971, the Phonemaster had been installed on the premises of several of Phonetele's customers without the utility's connection device. In January 1971, General notified a Phonemaster user that its telephone would be disconnected unless use of the Phonemaster was discontinued. Phonetele sought relief before the Commission. After hearing, the Commission determined (in decision No. 78891) that the Phonemaster was in no way detrimental to the telephone network, that the evidence was so clear on this matter that there was "no room for doubt," and that findings of fact to the contrary could not, in justice, be made. Therefore, it was concluded, the Phonemaster qualified for connection to the telephone system without the required addition of General's connecting device.

General petitioned for rehearing but before the Commission acted on the petition, Phonetele filed a complaint against Pacific based on an identical threat to discontinue telephone service to subscribers who used the Phonemaster device without a protective interconnection provided by Pacific. The Commission held hearings on the complaint against Pacific, granted General's petition for rehearing, and considered the complaints against the two utilities on the basis of a consolidated record. During the course of the proceedings, there was discussion regarding adoption of a certification program which would permit the connection of the Phonemaster to the telephone network without the utility-provided device. All the parties appeared to agree that it would be desirable to adopt a certification procedure for instruments like the Phonemaster.

Decision No. 80247 involved here declares that it is "possible" to design, manufacture, install and maintain a call diversion device like the Phonemaster for connection with the telephone system without a protective device provided by the utilities, but that the Phonemaster did not qualify for direct connection because of the following four factors:

1. *Design.* The design of the Phonemaster "could" cause cross-talk and excessive noise on the telephone network. However, this problem "might possibly not affect other customers." But lack of adequate time delay "could" cause misdirected telephone calls and improper billing.

2. *Manufacture.* Some models incorporated a power supply not listed by Underwriters Laboratories and not tested to insure against the passage of high voltage.

3. *Installation.* In two cases installation of the Phonemaster was defective.

4. *Maintenance.* Reasonable assurance of continuing proper operation was necessary.

All of these asserted deficiencies "can presumably be corrected," it is stated, but such correction "would seem to require" a certification program. Thus, "utility-provided protective connection devices are necessary and appropriate for the Phonemaster 1040 unless and until a suitable certification program is established and implemented."[2]

The two leading authorities on connecting customer owned and maintained equipment to the telephone system are *Re Use of Carterfone,* 13 F.C.C.2d 420, 430, and *Hush-a-Phone Corp.* v. *United States* (1956) 238 F.2d 266 [99 App.D.C. 190]. ■ These cases establish that the use of customer-owned equipment may be proscribed only if it is shown that the instrument in question will have an adverse effect upon the telephone network as a whole. *Carterfone* makes it clear that a showing that a device *might* harm the system is insufficient to justify proscription and that a finding of actual adverse impact on the network or at least a probability of such impact is required. (13 F.C.C.2d 420 at p. 424; 13 F.C.C.2d 430 at p. 435 et seq.) The Commission itself has held that an attachment must constitute an unreasonable burden or have a substantial adverse effect upon the telephone network in order to justify having its use enjoined. (*Bowles* v. *P.T.&T. Co.* (1966) Decision No. 71608, 66 Cal.P.U.C. 479, 490-491; see also *Lauria* v. *P.T.&T.Co.* (1966) Decision No. 70450, 65 Cal.P.U.C. 316, 326.)

The foregoing cases involved absolute prohibitions against the use of an attachment whereas here the issue is not whether the Phonemaster may be attached to the telephone system but whether the connection may be accomplished without a connecting device provided by the utilities. Never-

---

[2] Decision No. 80247 is designated as an "Interim Opinion" but it is clearly final insofar as it relates to the necessity for Phonetele to employ a protective connection provided by the utilities pending the implementation of a certification program.

theless the determinative principle in both circumstances relates to the effect of a device upon the telephone network as a whole, and the principles to be applied are the same in both situations.

■ Decision No. 80247 findings fall short of complying with the standards enunciated in apposite cases. The decision points to various defects in the Phonemaster, only one of which is specified as relating to the telephone system as a whole. "Lack of adequate time delay," it is stated, "could" cause misdirected telephone calls and improper billing. This finding obviously fails to support the Commission's conclusion that a utility-provided interface is "necessary" since the Commission made no determination that the Phonemaster, if installed without the protective connection, would actually have any adverse effect upon the telephone system, let alone a substantial adverse effect, nor is there any indication that such a result is reasonably probable.

The remaining purported defects enumerated in the opinion are not related to the telephone system as a whole, and some would not support a finding of a substantial adverse impact, even if such a finding had been made. For example, the Commission found that "some models" of the Phonemaster were not listed by Underwriters Laboratories and not tested to insure against the passage of high voltage. In its petition for rehearing before the Commission Phonetele asserted that it was willing to comply with the requirement of a power supply approved by Underwriters and that, in fact, oral approval had already been accorded by Underwriters. Obviously a defect which can be so easily remedied cannot be the basis of a conclusion that a protective connection is necessary in order to avoid substantial harm to the vast telephone system.

The Commission's conclusion that the correction of the defects "would seem to require" a certification program is a non sequitur. While a certification procedure, by specifying standards for customer-provided equipment, might assist the Commission, the utilities and the manufacturers of the instruments in evaluating the impact of a device on the telephone system as a whole, mere formulation of a program would not itself result in the correction of any of the deficiencies found by the Commission in the Phonemaster. The Commission's opinion concedes that it will be some time before a "possible" certification program has been devised, a prediction which has been corroborated by events: no certification program has been adopted in the nearly two years since decision No. 80247 was rendered.[3]

---

[3]The Commission ordered Pacific and General to present feasibility studies for a certification program. On April 2, 1973, 10 months after decision No. 80247 was

Phonetele makes numerous additional contentions. ■ It argues that the evidence before the Commission does not justify a conclusion that the use of the Phonemaster without the utility connection will result in either actual or potential harm to the telephone system, and Phonetele urges this court to substitute its judgment for that of the Commission and order direct connection of the Phonemaster. There was testimony that the Phonemaster presented some potential for damage to the telephone system; therefore the Commission should be afforded the opportunity to determine whether the evidence justifies a finding of actual or probable adverse effect upon the telephone system as a whole and the degree of harm thereof pursuant to the requirements described herein.

■ Phonetele also challenges the validity of a portion of tariff 135-T, which provides that customer-provided voice transmitting or receiving equipment which involves direct electrical connection with the telephone system must be accomplished by means of a connecting arrangement furnished by the utilities. Phonetele contends that this tariff is void because it was adopted without hearing by the Commission and that the requirement for a connecting arrangement provided by the utilities without regard to the harmful character of the attachment violates *Carterfone*. These matters were not directly raised in Phonetele's complaints or in the petition for rehearing before the Commission, and they are not discussed in decision No. 80247. In any event, the Commission attempted, with the erroneous result discussed above, to consider the effect of the Phonemaster on the telephone system as a whole as a basis for requiring that the utility connection be utilized.

Another assertion by Phonetele is that the Commission failed to make findings as to the antitrust aspects of its decision, in violation of our holding in *Northern California Power Agency* v. *Public Util. Com.* (1971) 5 Cal.3d 370, 379 [96 Cal.Rptr. 18, 486 P.2d 1218]. This defect was remedied in a supplemental opinion (No. 80891) in which the Commission rendered findings adverse to Phonetele on the antitrust issue.

Nevertheless the free enterprise aspects involved in this proceeding merit brief comment. The manufacture of instruments like the Phonemaster, designed to enhance the utility and reduce the cost of telephone service, is a relatively new and, as all parties concede, a rapidly growing industry.

filed, Pacific advised the Commission that in its view a certification program at a reasonable cost was not practical and that, in any event, consideration of such a program by the Commission should be postponed pending the adoption of national certification standards which were in the process of formulation. At oral argument in this cause Pacific changed its position again and urged a state certification program as the most effective solution.

Some of these devices conflict with the economic interests of the utilities in two respects: first, they are in direct competition with instruments provided by the utilities to perform similar functions, and second, they result in a reduction of utility revenue because they restrict the number of telephone calls subscribers may make. In the present case, for example, both utilities sell call diverters and, according to Phonetele, 10 days after decision No. 80247 was filed Pacific proposed to place on the market a new device which was "truly competitive" to the Phonemaster.[4] Phonetele does not raise serious objections to the findings of the Commission on the antitrust aspects of its supplemental opinion, and we do not express any opinion as to the merits of the Commission's findings in this respect. Nevertheless, the circumstances pointed out by Phonetele illuminate the necessity for a careful weighing of competitive factors. Where, as here, a finding in favor of the utilities will result in a potential threat to free competition, the Commission must be particularly solicitous to assure that its ultimate determination is warranted by the need to safeguard the telephone network as a whole.[5]

We do not intend to suggest that the Commission is powerless to adopt standards to assure that customer-owned equipment will not adversely affect the telephone system, or that it is prevented from reasonably enforcing those standards. Apparently the establishment of such a program involves a considerable delay. In the interim, since damage to the telephone system has not been demonstrated, telephone subscribers who choose to use the Phonemaster should be permitted to do so without incurring additional charges for connecting devices.

We order decision No. 80247 annulled. The Commission's order requiring the utilities to supply the protective devices to Phonetele customers without charge (see fn. 1, *ante*) is continued in effect unless and until the Commission, after further proceedings, finds, in accordance with the standards set forth above, that the Phonemaster will have an adverse effect upon

---

[4]Pacific's advice letter to the Commission regarding the new call diverter apparently was voluntarily withdrawn after Phonetele objected.

[5]The parties presented to this court, both immediately before and after oral argument, a voluminous amount of material involving issues not directly related to decision No. 80247. For example, the parties argue the validity of tariff 135-T in the light of recent federal decisions, and the legality of certain Commission actions taken subsequent to decision No. 80247 relating to the certification program as well as the adoption of possible alternatives to tariff 135-T. We are not required to and do not reach these matters in the present opinion.

the telephone network, or until an appropriate certification program is adopted and implemented by the Commission.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., Clark, J., and Taylor, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.