PHONETELE, INC., Plaintiff–Appellant,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY, et al., Defendants–Appellees.

No. 88–6353.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 1989.

Decided Nov. 6, 1989.

Rick M. Stein, Sanger & Stein, Palm Springs, Cal., for plaintiff-appellant.

George L. Saunders, Jr., Sidley & Austin, Chicago, Ill., for defendants-appellees.

Before FLETCHER and NELSON, Circuit Judges, and PRO,* District Judge.

FLETCHER, Circuit Judge:

Phonetele, Inc. appeals the judgment of the district court in favor of AT & T and related defendants (hereafter referred to collectively as "AT & T") on Phonetele's antitrust causes of action. Phonetele's principal claim on appeal is that the district court could not have found, on the evidence presented to it, that AT & T had carried its burden of proof on its affirmative defense of regulatory justification. Phonetele also argues that the district court erred in de-

fining the relevant market, and that Phonetele was deprived of a fair trial because the district court delayed its decision for four years. We affirm.

## I. FACTS

Phonetele manufactures and sells the "Phonemaster." The Phonemaster is a device of the type known generically as a "call restrictor," connected between a telephone and the rest of the telephone network to prevent the user from placing calls beyond a predetermined area. Its primary market consists of medium-to-large companies with numerous telephone extensions. The Phonemaster allows the company to restrict phone usage by employees or customers. It is a sophisticated device that not only can prevent unauthorized long-distance calls, but also can allow the company to designate exceptions, for example allowing employees to make long-distance calls only to certain area codes or prefixes.

This dispute first came before us in *Phonetele, Inc. v. AT & T,* 664 F.2d 716 (9th Cir.1981) (*Phonetele I*), where we reversed the district court's dismissal of Phonetele's complaint.[1] We held that, although the defendants' status as regulated common carriers did not confer antitrust immunity on them, an affirmative defense based on the realities of regulation was available to them:

> While a given regulatory scheme may not amount to the degree of necessity required to confer implied immunity on all activities of a regulated entity, some degree of necessity may be established as a matter of fact in individual cases. When the regulated entity assertedly attempts to respond to its duties as a common carrier by filing and implementing an anticompetitive tariff, the antitrust laws do not apply to the tariff without regard to the technical and legal constraints flowing from the regulatory structure. *If a defendant can establish*

---

* Hon. Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

1. The district court had dismissed on the grounds that the FCC and state utilities commis- sions had exclusive jurisdiction and that the Communications Act of 1934, 47 U.S.C. §§ 151–609, conferred an implied antitrust immunity on the defendants' activities. *Phonetele I,* 664 F.2d at 721.

*that, at the time the various anticompetitive acts alleged here were taken, it had a reasonable basis to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, then its actions did not violate the antitrust laws.* At this stage in the proceedings, *it appears this inquiry will depend largely on whether the facts show the companies did reasonably conclude, given their expertise, that uncontrolled NCSU [Network Control Signal Unit[2]] interconnection would endanger their own equipment or disrupt their own signal transmissions in identifiable ways, and also that the tariff as filed was a reasonable, properly focused mechanism, considering other alternatives then available, to prevent such real harm from occurring.*

664 F.2d at 737–38 (emphasis added). The district court assumed throughout this case, and AT & T does not dispute, that AT & T's restrictions on interconnection would be an antitrust violation unless AT & T could justify the restrictions.

Phonetele's appeal accordingly focuses on AT & T's conduct in seeking, opposing and implementing various regulatory measures directly affecting the Phonemaster. A brief history of telephone regulation as it relates to such "ancillary" devices[3] is therefore necessary for an understanding of this case.

The Bell System originally had complete responsibility for the operation of the telephone system and ownership of all telephone equipment, including the user's telephone itself. Tariffs existed prohibiting the attachment of any non-Bell equipment to the network. In 1947, the Federal Communications Commission (FCC) allowed recording devices to be physically attached to the telephone line on the condition that the equipment necessary to make such physical connection was provided, installed, and maintained by the Bell System. *Use of*

*Recording Devices,* 11 F.C.C. 1033 (1947). Then, in 1968, the FCC entered its *Carterfone* decision. *Use of the Carterfone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420 (1968). That decision announced a broad holding:

> [A] customer desiring to use an interconnecting device to improve the utility to him of ... the telephone system ... should be able to do so, so long as the interconnection does not adversely affect the telephone company's operations or the telephone system's utility for others. A tariff which prevents this is unreasonable....
>
> There has been no adequate showing that non-harmful interconnection must be prohibited in order to permit the telephone company to carry out its system responsibilities.... We are not holding that the telephone companies may not prevent the use of devices which actually cause harm, or that they may not set up reasonable standards to be met by interconnection devices. These remedies are appropriate; we believe they are also adequate to fully protect the system.

13 F.C.C.2d at 424.

AT & T was invited to file new tariffs. It responded with new tariffs providing that permission to attach ancillary equipment was conditioned upon attachment through a "connecting arrangement" to be supplied by AT & T. The FCC allowed these tariffs to go into effect without hearing or investigation but refused to approve them expressly. *American Telephone and Telegraph Co. "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605, 610 (1968).

The FCC appears to have taken this somewhat ambivalent position because of the novelty of its policy requiring the Bell System to permit interconnection. Interconnection posed technical and economic problems of considerable complexity. *Car-*

---

**2.** Network control signaling consists of the transmission of signals to perform functions such as call supervision, dialing, called number identification, and audible tone signals. The Phonemaster is one type of NCSU.

**3.** An ancillary device is one, like the Phonemaster, which is attached to the telephone network but does not replace any component of that network.

*terfone* opened up the possibility of a great many manufacturers designing and selling equipment to be attached to the network. The FCC therefore implemented a study period. Two means of preventing harm to the network were readily apparent. One was to require protective connecting arrangements (PCAs), the option selected by AT & T. The other was to develop standards for interconnecting attachments. This latter option had several problems. Either AT & T would have had to set standards and ensure compliance itself (an option subject to anticompetitive problems), or else a federal bureaucracy would have been required to do so.

The FCC requested the National Academy of Sciences (NAS) to review the technical problems of interconnection and to make recommendations. The NAS issued its report in June, 1970. This report identified four general types of harm which could result from the electrical connection of ancillary devices: (1) dangerously high voltages;[4] (2) excessive amplitude;[5] (3) improper line balance;[6] and (4) improper control signals.[7] The NAS concluded that PCAs were a technically acceptable way to prevent these harms from occurring. It also concluded that a registration program would be effective only if it provided for

approval of designs, certification of installation methods, testing of equipment, and oversight of maintenance.

The FCC next commissioned a consultant's report on the practical methods by which the NAS recommendations could be implemented. This report was critical of the time, expense, and effort needed to implement a registration program as envisioned by the NAS. Nevertheless, the FCC began studying the possibility of a standards approach for certain types of equipment. It started with a device called the PBX.[8] Phonetele asked the FCC to study a standards program for call restrictors, but the FCC declined to do so.

By 1972, it became apparent that the FCC was leaning towards adopting a streamlined registration system without certification of installation, testing or maintenance. AT & T was bitterly opposed to such a system, and openly expressed its opposition. AT & T decided to continue the PCA requirement and to resist the imposition of a streamlined registration program.[9]

In 1975, the FCC proposed a comprehensive new registration program. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Ser-*

---

**4.** Most household appliances use 110 voltage, but the telephone system uses considerably less. Most devices intended to be connected to the telephone system, including the Phonemaster, use 110 voltage. Telephone lines must be protected from the accidental entry of 110 voltage, because such voltages could result in the death of telephone line workers.

**5.** Signals of excessive amplitude can leak into neighboring telephone lines causing noise and cross talk.

**6.** Improper line balance results from the introduction of a higher current into one side of the line than the other. This, too, produces interference on other lines.

**7.** Control signals direct calls to their intended destination. Improper control signals can cause various problems, including misdirection of calls.

**8.** A PBX is a Private Branch Exchange, a switching mechanism located on the premises of the telephone customer, through which calls to and from extension telephones are funneled.

**9.** As previously indicated, any registration system required the cooperation of the FCC, in that it was clear that registration would need to be performed by a body other than AT & T. AT & T was not in a position to enact registration unilaterally, although it was of course in a position to argue more forcefully in favor of a suitable registration system. The district court found that AT & T did not oppose registration until it became clear it could not achieve the sort of registration program it deemed necessary. The district court specifically found that this opposition was not a "sham" engaged in for purposes of delay, and, therefore, was shielded from antitrust liability by the *Noerr–Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mineworkers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *See also California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (finding that appellees efforts to harass and deter respondents in their use of administrative and judicial proceedings came within the "sham" exception of the *Noerr* case).

vice (WATS)—First Report and Order, 56 F.C.C.2d 593 (1975), modified in part, 57 F.C.C.2d 1216 (1976), aff'd sub nom. North Carolina Util. Comm'n v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). Under this program, the FCC would set standards for all ancillary electrical devices. The Phonemaster was registered under this program, and since that time it has not been necessary to install a PCA in order to use a Phonemaster.

Meanwhile, proceedings directly involving the Phonemaster were taking place before the California Public Utilities Commission (CPUC). Phonetele was preparing to market the Phonemaster in California in late 1970. It notified AT & T of the need for a PCA. A Bell Labs engineer, under time pressure from Phonetele, designed a PCA, which was denominated the CTD. A schematic drawing was delivered to Phonetele in March 1971. Phonetele indicated the PCA was suitable. The CTD was used only by the Pacific Telephone and Telegraph Company ("PT & T") in California, where it was redenominated the ZZAGM.[10] At some point Phonetele adopted the position that a PCA was unnecessary and that the Phonemaster could be connected directly without harm.

Clashes soon arose in the territory of General Telephone Company of California ("General Telephone") when Phonetele made a connection of the Phonemaster directly into the network. General Telephone sought to disconnect. The matter was presented to the CPUC. The CPUC ordered General Telephone to allow direct interconnection. Phonetele then adopted the same position in the territory of PT & T, which resulted in additional litigation before the CPUC. Phonetele refused to test the ZZAGM with its equipment. In November 1971, the CPUC ruled that the PCA requirement was valid, reversing its prior order to General Telephone. In Phonetele, Inc. v. General Telephone Co. of

California, Interim Opinion and Order, Cases No. 9177 & 9265 (1972), the CPUC found that the Phonemaster as it then existed had the potential to cause crosstalk and excessive noise on the network, misdirected telephone calls, improper billings, and high voltage. The CPUC concluded from the existence of these potential harms that General Telephone's PCA requirement was reasonable, until such time as a certification program was implemented. In a subsequent decision by the CPUC, the utilities were ordered to supply the PCA to Phonetele customers without charge. See Phonetele, Inc. v. Publ. Util. Comm'n, 11 Cal.3d 125, 127 n. 1, 113 Cal.Rptr. 16, 520 P.2d 400 (1974).

Upon review of the CPUC decision, the California Supreme Court reversed the CPUC's decision that the PCA requirement was "necessary" to prevent harm to the telephone system because the CPUC had applied the wrong standard. Phonetele, 11 Cal.3d at 128, 113 Cal.Rptr. 16, 520 P.2d 400. The California Supreme Court did not, however, hold that the Phonemaster could be directly connected to the telephone network, or that certification was necessarily preferable to a PCA requirement. According to the Supreme Court, the CPUC should have asked whether the evidence demonstrated that the Phonemaster would have an actual or probable (as opposed to possible) adverse effect upon the telephone system. 11 Cal.3d at 129–30, 113 Cal.Rptr. 16, 520 P.2d 400. The Supreme Court continued in effect the CPUC's order requiring utilities to supply the protective devices free of charge until the Commission reconsidered the evidence in light of the proper standard or implemented a certification program. 11 Cal.3d at 132–33, 113 Cal.Rptr. 16, 520 P.2d 400.

In April, 1975 the CPUC issued an Order which, like the FCC program, permitted the direct connection of certified devices. This decision became final in May, 1976. In

---

**10.** Phonetele argues that the change in designation of the PCA from "CTD" to "ZZAGM" was intended to conceal the fact that the CTD/ZZAGM harmed the network. Phonetele offers no evidence to support this allegation.

The district court found that the change in name was nothing more than the result of different nomenclature employed by PT & T and AT & T.

1977, the CPUC ruled that PCAs were not necessary to prevent actual or probable harm to the telephone network. *Order Denying Rehearing and Stay Modifying Decision No. 87620,* Decision No. 87920, Case No. 9625 (1977).

## II. DISCUSSION

### A. *Standard of Review*

■ The standard of review of a regulatory justification defense has not yet been decided by this circuit. We referred to the defense in *Phonetele I* as a "factual justification[ ]," to "be established as a matter of fact in individual cases," 664 F.2d at 737–38. The closely related question of whether there was a business justification for an alleged tying arrangement was submitted to the jury in *Mozart Co. v. Mercedes–Benz of North America, Inc.,* 833 F.2d 1342, 1350–51 (9th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). We reviewed to see whether there was substantial evidence to support the jury's verdict. *Id.* We conclude that regulatory justification as a defense to a monopolization claim similarly should be viewed as a factual inquiry and the district court's determination reviewed by us under the clearly erroneous standard. Phonetele also argues that specific facts found by the district court are incorrect or lack support in the record. We review such arguments under the clearly erroneous standard. Fed. R.Civ.P. 52(a). This rule applies equally to facts found from a written record. *Id.*

### B. *Sufficiency of the Evidence*

■ Phonetele's appeal challenges AT & T's conduct in the years between *Carterfone* and the adoption by the FCC and the CPUC of registration programs. Phonetele alleges that AT & T's opposition to registration and insistence on PCAs during this period was intended to prevent Phonetele from entering or succeeding in the market. AT & T argues, conversely, that its concern was to protect the quality of the telephone network.

The district court rejected Phonetele's contention that AT & T acted unreasonably in not establishing a certification program for call restrictors. The district court relied on the fact that the FCC was studying the feasibility of a certification program in a more deliberate manner, and in doing so was following the recommendation of the NAS. In light of the fact that the FCC and CPUC both permitted the requirement of PCAs pending the creation of a certification program, the district court's conclusion that AT & T acted reasonably was not clearly erroneous. That the FCC and CPUC subsequently decided that registration was the best solution to the interconnection problem does not prove that AT & T's PCA requirement was *unreasonable* prior to those decisions.

The district court read our opinion in *Phonetele I* as leaving open a central issue in this case: whether the problem of interconnection and the filing of tariffs was to be viewed "from the standpoint of dangers to the system from the interconnection of unknown multitudes of electrical equipment," *Excerpt of Record* 66, or from the standpoint of the Phonemaster considered on its own. The district court concluded that the relevant inquiry in determining whether AT & T's tariffs were reasonable should focus on whether "ancillary equipment of a particular type poses dangers to the telephone system," rather than "whether a particular manufactured device necessarily poses such dangers." *Id.* The "particular type" relevant to this case was deemed to be "telephone call restriction equipment in general." *Id.* Phonetele does not challenge this conclusion.

The district court found that, in enacting its tariffs, AT & T was acting on the basis of its reasonable belief as to how best to provide effective telephone service to the public, based on technical imperatives known to it and recognized as legitimate by the regulating authorities. This finding is not clearly erroneous in light of the regulatory history described above. The CPUC found that direct connection of the Phonemaster could endanger equipment and disrupt signal transmissions in identifiable ways, and both the CPUC and the FCC considered the PCA to be a reasonable, properly focused mechanism to prevent

such harms from occurring. True, the California Supreme Court vacated the CPUC's ruling and invited the Commission to investigate the harms further, but even during this period, when the need for a PCA in conjunction with the Phonemaster was in doubt, the local operating companies were permitted to require PCAs to be used, as long as they were provided to the customer free of charge. As a result, even if AT & T was not reasonable in believing PCAs to be *necessary* with the Phonemaster after the California Supreme Court's remand, Phonemaster cannot demonstrate any injury resulting from the PCA's continued use. Although Phonetele's position ultimately prevailed both before the FCC and before the CPUC, the test we articulated in *Phonetele I* only requires the defendant to establish that its conclusion "that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority" was *reasonable* at the time its conclusion was reached. *Phonetele I*, 664 F.2d at 737–38. AT & T was specifically permitted by the regulatory agencies to require a PCA to be used with the Phonemaster during a period when those agencies had not yet resolved the dispute between the merits of certification and protective devices. Until the issue was actually decided against PCAs, AT & T acted reasonably in requiring a PCA.

■ Phonetele also argues that AT & T and the local operating companies acted unreasonably in applying the tariffs to the Phonemaster. None of Phonetele's arguments in this regard have merit.

During the CPUC proceedings, the CPUC entered an order, never terminated, that the local operating companies could not charge for the use of the ZZAGM. As a result, for much of the relevant time period Phonetele's customers did not have

to pay for the ZZAGM, and indeed could have benefitted from additional savings because Phonetele did not have to include duplicative protective circuitry in the Phonemaster itself.[11] Thus, as the appropriateness of requiring a PCA to be used with the Phonemaster began to be cast in doubt, the costs of that requirement were imposed on the utilities, minimizing any harm to Phonetele.

The ZZAGM was not approved by AT & T for nationwide use because AT & T determined that the ZZAGM did not provide sufficient protection against "blockage" and "glare."[12] The district court found that blockage and glare could degrade the quality of telephone service. The ZZAGM did not protect against these problems because the Bell Labs engineer responsible for the ZZAGM assumed that Phonetele would supply a delay to eliminate glare and did not recognize the blockage problem. In addition, between 1971 and 1974 the ZZAGM failed to correct longitudinal imbalance,[13] and in fact added to the problem. This problem was the indirect and unintentional result of disagreement between PT & T and Phonetele over the number of prongs to be used in the Phonemaster's plug. The ZZAGM was originally designed for use with a six-pronged Phonemaster, but was converted to four-prong use when Phonetele insisted on a four-prong plug. It was during this conversion that an engineering error was made, creating the longitudinal imbalance problem.

Phonetele argues that it was thus required to use a *defective*, not merely unnecessary, PCA. The district court rejected this argument on the grounds that Phonetele's customers did not have to pay for the ZZAGM, and the ZZAGM did protect against other major harms, especially high voltage and excessive amplitude. While it

11. It is unclear whether this cost savings was in fact passed on to Phonetele's customers. It is also unclear by how much the cost of the Phonemaster was or could have been reduced.

12. Blockage and glare are technical problems specifically associated with call restriction devices, which operate by opening and closing telephone lines. If the timing is not right, incoming calls can inadvertently be blocked by

the device; this is called "blockage." If the line is closed before the user hangs up, incoming calls can be sent to the wrong extension; this is called "glare." These problems are endemic to the Phonemaster but can be minimized by careful timing of the disconnecting sequence.

13. Longitudinal imbalance can result in noise on the telephone lines of other users.

would be irrelevant that the ZZAGM was provided free of charge if it in fact degraded the quality of Phonetele's product, the district court's finding that the ZZAGM was not on balance harmful, but rather did more good than harm, is not clearly erroneous. Also, that the one problem added by the ZZAGM, longitudinal imbalance, affected only the lines of other users rather than the lines of the Phonemaster user, suggests that the utilities were harming themselves more than Phonetele by failing to correct the longitudinal imbalance problem. Phonetele cites no evidence that any of its customers ever complained about their Phonemaster because of problems associated with longitudinal imbalance.

On the national level, AT & T continued to develop the original CTD, achieving an improved final version in 1972.[14] The final CTD was designed to be used with a variety of call restricting equipment, including but not limited to the Phonemaster. The district court found that the final CTD was ready for use before Phonetele was ready to enter the national market.[15] Phonetele, however, insisted at that time that if a PCA were to be required, it was under no obligation to accommodate its product to a general purpose PCA. The final CTD worked with the Phonemaster except for one wrinkle: the Phonemaster was designed to inform the telephone user that a call was restricted with the opening four-note motive from Beethoven's Fifth Symphony; the final CTD required the substitution of a dial tone or busy signal.[16] In the face of Phonetele's opposition to the final CTD, AT & T designed two new PCAs specifically for the Phonemaster, one which was used when a Phonemaster was sold to the New York Times in 1974, and a second, never needed, to be used behind key systems. The district court's finding that Phonetele was not delayed in entering the national market by AT & T's failure to have a compatible PCA ready was not clearly erroneous.

Phonetele also argues that PT & T obtained favorable rulings from the CPUC by presenting its case before that commission fraudulently. The district court found that PT & T did not act fraudulently, and Phonetele does not cite to this court any evidence which would persuade us that the district court's finding in this regard was clearly erroneous.

## C. *Written Testimony and Delay in Decisionmaking*

■ Phonetele argues that the district court's permission to both sides to use direct written testimony, in combination with the court's delay of almost four years in reaching its decision, requires reversal. According to Phonetele, AT & T's written direct testimony "assumed an importance far eclipsing the testimony of live witnesses and substantial documentary evidence presented by Phonetele" as the years passed and the district judge's memory dimmed. Appellant's Brief at 54. Phonetele concedes, however, that its own exhibits and recorded transcripts of its own evidence were available to the district court, reducing its claim to the argument that AT & T's evidence was prejudicial simply because it was in some way clearer or more

---

**14.** This version will be called the "final CTD" to distinguish it from the ZZAGM.

**15.** Phonetele asserts that the final CTD never actually existed and was never made available for testing with the Phonemaster. This assertion is directly contradicted by one of Phonetele's own memoranda, introduced at trial, discussing the final CTD's compatibility with the Phonemaster.

**16.** The final CTD was also not usable behind "key systems," smaller systems which did not comprise more than a minimal portion of Phonetele's market because of the expense of the Phonemaster.

Phonetele also argues that AT & T's pressure for it to build a 1.5 second time delay into the Phonemaster, in order to reduce the problems of blockage and glare, was undertaken in bad faith. However, Phonetele argues only that the Phonemaster worked without such a delay; it does not cite evidence that use of a 1.5 second delay would not have helped prevent network harm. PT & T in fact allowed the Phonemaster to be installed without the 1.5 second delay. Phonetele's argument also suffers from an internal contradiction: in opposing the 1.5 second delay, Phonetele was resisting AT & T's attempts to suggest or impose standards, despite Phonetele's litigation position that standards rather than PCAs were the proper protective solution.

easily accessible than Phonetele's testimony. Because Phonetele was also given the opportunity to present its direct testimony in written form, we fail to see how any prejudice resulting from the relative lack of clarity of the record created by Phonetele at trial can in any way be blamed on the ruling of the district court.

■ The use of written testimony is an accepted and encouraged technique for shortening bench trials. *Malone v. U.S. Postal Service*, 833 F.2d 128, 133 (9th Cir. 1987), *cert. denied*, — U.S. —, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988) (upholding district court's authority to *compel* written testimony). Although Phonetele argues it was prejudiced by AT & T's use of written testimony because AT & T had obtained valuable experience from litigating prior antitrust cases, Phonetele could have made an attempt to close this experience gap by reviewing those prior cases itself. More importantly, even if Phonetele could not realistically have undertaken such a review, Phonetele had the undisputed benefit of five days prior notice of what AT & T's direct testimony would be, presumably making it easier for Phonetele to cross-examine AT & T's witnesses.

■ Nor is our conclusion affected by the district court's delay in rendering its decision. We are appalled by the delay, but we are aware of no case holding that a district court commits reversible error by taking too long to decide a case. Indeed, we doubt that appellate review could ever be an effective means of enforcing district court timeliness. On appeal, this court may take one of three actions: affirm the district court's decision, remand to the district court to reconsider or explain its decision, or reverse the district court's decision. To vacate and remand a decision which the district court has spent several years crafting hardly seems a sensible means to reduce delay. To reverse the decision on the ground of delay would require us to presume that lengthy deliberation inevitably leads to mistake. Phonetele suggests that the district court's delay is evidence of its disinterest in or ignorance of the case. Although we do not condone the long delay, we are not willing to assume without strong independent support that the district court departed from its proper role and considered only the evidence that was easiest to recall. *But cf. Ciccarello v. Graham*, 296 F.2d 858, 860 (5th Cir.1961) (but noting that remand might be proper if appellant made a convincing showing of prejudice).

D. *Relevant Market*

■ Phonetele asserts as its final ground for reversal that the district court erred in limiting the relevant market to "ancillary stand-alone programmable toll restriction equipment electrically connected to the telephone network." *Excerpt of Record* 59. The definition of the relevant market is a factual inquiry reversible only for clear error. *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1446 (9th Cir.1988). We find no clear error in the district court's market definition. The district court applied the correct legal standard in defining the market, limiting the market to include only products which could compete with the Phonemaster, as opposed to including all ancillary equipment whatever its function. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Phonetele does not inform us what it believes the proper market definition should be, arguing only that "the market must be defined as broadly as possible." Appellant's Brief at 60. Nor has Phonetele suggested how a change in the relevant market would affect the outcome of this case under any of its antitrust theories.

CONCLUSION

After the district court entered its decision in favor of AT & T, Phonetele was left with the impression that "something is seriously wrong with the opinion" of the district court. Appellant's Reply Brief at 24. Phonetele has not, however, succeeded in articulating to this court any reasons for this impression which would require remand or reversal. The district court's findings of fact are not clearly erroneous.

Phonetele was not prejudiced by the district court's delay in entering its decision. The judgment of the district court is AF-FIRMED.